**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE,
                    *Plaintiff-Appellant*,

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA; DOES, 1–20,
                    *Defendants-Appellees.*

No. 20-55831

D.C. No.
2:19-cv-10385-
PSG-MRW

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, Chief District Judge, Presiding

Argued and Submitted October 20, 2021
Pasadena, California

Filed January 11, 2022

Before:  Consuelo M. Callahan and Danielle J. Forrest,
Circuit Judges, and Carol Bagley Amon,* District Judge.

Opinion by Judge Callahan

---

  * The Honorable Carol Bagley Amon, United States District Judge
for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Title IX

The panel reversed and vacated the district court's order and judgment dismissing a Title IX action brought by John Doe, a Chinese national graduate student, and remanded for further proceedings.

Doe alleged that the University of California, Los Angeles, violated Title IX when it discriminated against him on the basis of sex in the course of a Title IX disciplinary proceeding instituted after a former student accused him of misconduct.

Following *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020), the panel held that Doe stated a Title IX claim because the facts alleged in his first amended complaint, if true, raised a plausible inference that the university discriminated against him on the basis of sex. The panel concluded that Doe's allegations of external pressures impacting how the university handled sexual misconduct complaints, an internal pattern and practice of bias in the University of California and at UCLA in particular, and specific instances of bias in Doe's particular disciplinary case, when combined, raised a plausible inference of discrimination on the basis of sex sufficient to withstand dismissal.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mark M. Hathaway (argued) and Jenna E. Parker, Hathaway Parker Inc., Los Angeles, California, for Plaintiff-Appellant.

Hailyn J. Chen (argued), Munger Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

CALLAHAN, Circuit Judge:

Based on a former student's bare allegations of misconduct, and before beginning a formal Title IX investigation, the University of California, Los Angeles (the "University" or "UCLA") issued an immediate interim suspension of John Doe[1], a Chinese national graduate student just months away from completing his Ph.D. in chemistry/biochemistry. Over five months later, the University suspended Doe for two years after finding he violated the University's dating violence policy by placing Jane Roe "in fear of bodily injury," just one of the thirteen charges the University brought against him. As a result, Doe lost his housing, his job as a teaching assistant on campus, his ability to complete his Ph.D., and his student visa.

---

[1] Appellant uses the pseudonyms of "John Doe" and "Jane Roe" throughout the complaint "to preserve privacy in a matter of [a] sensitive and highly personal nature."

Doe sued the University through The Regents of the University of California (the "Regents"[2]), alleging that it violated Title IX when it discriminated against him on the basis of sex in the course of his Title IX disciplinary proceeding. In granting the Regents' motion to dismiss, the district court concluded that Doe's general allegations were insufficient to state a Title IX claim under either the erroneous outcome theory or the selective enforcement theory. We disagree.

As we clarified in *Schwake v. Arizona Board of Regents*, 967 F.3d 940, 947 (9th Cir. 2020), the relevant inquiry on a motion to dismiss a Title IX claim in this context is whether the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex. Therefore, the central question here is whether Doe's First Amended Complaint ("FAC") meets this standard. We hold that it does. Accordingly, we reverse the district court's dismissal and remand.

## I.

Because this appeal arises from a motion to dismiss, we accept as true the well-pleaded allegations contained in the operative complaint and construe them in the light most favorable to Doe. *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020).

---

[2] According to the complaint, The Regents of the University of California refers to the public corporation that governs and operates the University of California as a public trust through its 26-member board. Accordingly, we use singular verbs throughout this opinion, as the "Regents" refers to a single entity.

A. *Factual Background.*

At all relevant times herein, Doe was a Chinese national graduate student at UCLA on a student visa pursuing his Ph.D. in chemistry/biochemistry. He first met then-UCLA student Jane Roe in a chemistry class during the spring quarter of 2014, and the two began dating that summer. Their long-term romantic relationship continued, and the couple became engaged in December 2016. They planned to marry after Doe was scheduled to graduate with his doctorate in June 2017.

However, the relationship ended abruptly in February 2017, after Doe learned that Roe had been unfaithful to him throughout their relationship. On February 12, Doe sought to break off his engagement with Roe and the two met briefly outside Roe's home. The next morning, by text message, the pair agreed to meet on campus *after* Doe completed teaching his course and after Roe got off work on February 13, to exchange property that each had in their possession. Sometime thereafter, Doe learned that Roe had withdrawn the entire balance of approximately $8,000 from their joint bank account.

At about 9:45 a.m. on February 13, Roe showed up unannounced to Doe's teaching assistant office on campus, before he was scheduled to teach, to confront him. Roe was not an active student enrolled at UCLA at the time. Roe pounded on the door repeatedly, without announcing herself, until Doe answered. Doe, who was meeting with another graduate student at the time, refused to let Roe into his office. Roe demanded that Doe return her Social Security card which she claimed Doe had in his possession. When Doe asked for his engagement ring back, Roe said she had thrown it into the ocean.

Doe explained that he needed to leave to teach his class and asked Roe to wait until he was finished, but Roe refused to let him leave his office.  Roe attempted to block Doe's doorway with her arms stretched out and threatened to call the police to have Doe arrested.  Eventually, Doe was able to get around Roe to get to his class.  Roe followed him and unsuccessfully tried to prevent him from entering his classroom.

While Doe taught his class, Roe called the University police to report that Doe had pushed her in the upper torso area and grabbed her wrist and forearm.  Based on this report, University police arrested Doe for misdemeanor domestic battery after he completed teaching his class.

Two months after the incident, on April 13, Roe lodged a Title IX complaint with the University against Doe, alleging thirteen instances of misconduct, some dating back to the Fall of 2014.  Although she was no longer a student at UCLA at the time of the February incident (or at the time she filed her Title IX complaint), she represented to the University that she was.  UCLA did not verify Roe's status as a student.  Roe also reported as part of her Title IX complaint that she had suffered a rib fracture from her encounter with Doe on February 13.  The University ultimately found this to be untrue.

On May 10, 2017, the University's Title IX Office and the Office of Student Conduct issued a joint Notice of Charges to Doe, charging him with violations of policies relating to dating violence, conduct that threatens health or safety, stalking, sexual harassment, terrorizing conduct, and sexual assault.  Pending resolution of the investigation of these charges, and without a hearing, the Office of the Dean of Students immediately suspended Doe on an interim basis,

banned him from UCLA property, and evicted him from student housing.[3]

UCLA Title IX Investigator Sonia Shakoori took over responsibility for the investigation. Doe and his advisors[4] met with Ms. Shakoori on July 25, 2017, to answer her questions and provide a written statement of events. On September 11, 2017, Doe was provided with limited, online access to a summary of information collected during Ms. Shakoori's investigation and a brief opportunity to comment or provide new information.

On September 15, 2017, the University issued a joint amended Notice of Charges to Doe, adding four additional alleged incidents of misconduct. Regarding the February 13, 2017, incident, the amended Notice of Charges stated that Doe "engaged in one incident of Dating Violence . . . in that he assaulted [Roe] outside of his office." On September 22, 2017, after Doe had a brief opportunity to review and respond to the new notice, Ms. Shakoori issued her final Investigation Report in redacted form. The report concluded that Doe was only responsible for the February 13, 2017, incident but found that this incident violated four separate UC policy provisions contained in both the University of California Policy for Sexual Violence and Sexual Harassment ("SVSH Policy") and the UCLA Student Conduct Code (although these violations were not contained in the joint amended Notice of Charges). Doe was found to

---

[3] Doe appealed the interim suspension, and following a special hearing held on May 22, 2017, the University modified the interim suspension to allow Doe to participate in certain activities on campus.

[4] Although his advisors were allowed to attend, Doe alleges that per University policy, as an accused, his advisors were not allowed to speak, advocate, or participate in the Title IX investigation or adjudication.

be not responsible for the other twelve allegations brought against him.  The report also found that Roe suffered no bodily injury on February 13, 2017, instead finding that Doe had placed Roe "in reasonable fear of serious bodily injury."[5]  Associate Dean of Students Jasmine Rush adopted this finding as well.

Over Doe's written objections, on October 13, 2017, Dean Rush accepted the report's findings of responsibility for the February 13, 2017, incident but found that Doe had only violated the UC SVSH Policy for Dating Violence (section II.B.1.c.i.) and UCLA Student Conduct Code section 102.08 as a result.  As a sanction for these violations, Dean Rush suspended Doe from UCLA for two years.

On October 27, 2017, Doe timely appealed Dean Rush's decision to the University's internal appeal body pursuant to the UC SVSH Policy.  Following an appeal hearing on December 8, 2017, the internal appeal body affirmed Dean Rush's decision and the two-year suspension sanction became effective on December 13, 2017.

On February 13, 2018, Doe filed a petition for writ of mandamus against the Regents in Los Angeles Superior Court, in which he challenged the disciplinary proceedings and decision rendered by the University.  On April 3, 2018, Judge Chalfant granted Doe's motion to stay the decision and sanction, finding in relevant part that the evidence did not support the University's findings.  Not long thereafter, on May 22, 2018, the Regents filed a Confession of

---

[5] Doe alleges that the UC SVSH Policy defines "Dating Violence" as "conduct by a person who is or has been in a romantic or intimate relationship with the Complainant that intentionally, or recklessly, causes bodily injury to the Complainant or places the Complainant in reasonable fear of serious bodily injury."

Judgment stating that the Regents believed that Doe's petition should be granted.  The court therefore entered judgment in Doe's favor, the Regents' decision and sanction were vacated and set aside, and the matter was remanded for the Regents to reconsider its action.  But this relief came too late, and Doe lost his student visa status.

## B.  *Procedural Background.*

On December 6, 2019, Doe filed a complaint with the district court stating eight causes of action for violations of Title IX, the Fourteenth Amendment, and state law.  On the Regents' motion, the district court dismissed the Fourteenth Amendment and state law claims finding they were barred by the Eleventh Amendment.  The district court also dismissed Doe's Title IX claims because he failed to allege that gender played a role in either the decision to initiate proceedings or their outcome, but it granted Doe leave to amend those claims.

On May 8, 2020, Doe filed his FAC stating two Title IX causes of action—one on an erroneous outcome theory and one on a selective enforcement theory.  In granting the Regents' motion to dismiss the FAC for failing to state a claim, the district court, citing *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), held that Doe's general allegations were insufficient.

Addressing Doe's erroneous outcome theory cause of action, the district court relied heavily on our decision in *Austin v. University of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019), and reasoned that Doe, like the plaintiffs in *Austin*, "does not make any plausible link connecting … the University's disciplinary actions to the fact that [he is] male" because "[j]ust saying so is not enough."  The district court

here did note that Doe had included some gender-based allegations that were particular to his proceedings in his FAC but held that these allegations "do not convince the Court that sex discrimination was the source of any error."

Addressing Doe's selective enforcement theory cause of action, the district court concluded that the "allegations are insufficient to allege that [Doe] 'was treated differently than similarly situated members of the opposite sex, or that the disciplinary policies were biased against [Doe] based on his gender.'"

Finally, the district court declined to grant leave to amend because it deemed amendment futile. Doe timely appealed.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review a grant of a motion to dismiss de novo. *Karasek*, 956 F.3d at 1104. In doing so, we accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Id.*; *see also In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

## III.

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex[6], be excluded from participation in, be denied the

---

[6] Although we recognize the definitional differences between the two terms, throughout this opinion we use the term "sex" interchangeably with "gender" to mean "sex" under Title IX. *See, e.g.*, *Emeldi v. Univ. of Or.*, 698 F.3d 715, 723 (9th Cir. 2012) ("Title IX of

benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…." 20 U.S.C. § 1681(a). Doe alleges that the Regents violated Title IX in its handling of the disciplinary proceedings instituted against him following the complaint lodged by Roe. The only issue on appeal is whether Doe sufficiently pled that he was discriminated against "on the basis of his sex" during the course of the disciplinary proceeding.[7] We turn first to the applicable pleading standard and then to the sufficiency of Doe's allegations.

A. *Pleading Standard for Title IX Claims.*

In *Schwake v. Arizona Board of Regents*, we recently clarified the applicable pleading standard for Title IX claims asserted in the disciplinary proceeding context.[8] Consistent with the standard enunciated by the Seventh Circuit in *Doe v. Purdue University*, 928 F.3d 652, 667–68 (7th Cir. 2019),

_____

the Education Amendments of 1972 bars gender-based discrimination by federally funded educational institutions.").

[7] Doe sufficiently alleges that the University receives federal funding and that he was "excluded from participation in [or] denied the benefits of … [an] education program" when the University suspended him. 20 U.S.C. § 1681(a).

[8] The opinion in *Schwake* was published two weeks after the district court's order below. The district court's decision, therefore, was largely based on the Ninth Circuit precedent in place at the time, *Austin v. University of Oregon*. However, because the central inquiry under both cases is the same, we find that Doe's FAC satisfies the pleading standards as stated in both *Austin* and *Schwake*. For that reason, while we may grant leave to amend in situations where the controlling precedents change midway through the litigation, amendment is not necessary here where the FAC as currently plead satisfies both pleading standards. *See Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma County.*, 708 F.3d 1109, 1117–18 (9th Cir. 2013).

we held that a party stating a Title IX claim need not meet the doctrinal tests (i.e. the erroneous outcome theory or the selective enforcement theory) superimposed on the statute by some circuits because "'at bottom, they all ask the same question.'" *Schwake*, 967 F.3d at 947 (quoting *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019)). That question is "whether 'the alleged facts, if true, raise a plausible inference that the university discriminated [against the plaintiff] 'on the basis of sex'[]." *Id.* at 947 (quoting *Columbia Coll. Chi.*, 933 F.3d at 854–55). "There is no heightened pleading standard for Title IX claims." *Id.* at 949*; see Austin*, 925 F.3d at 1137 n.4.

*Schwake* also clarified two important points for considering whether a Title IX complaint can survive a motion to dismiss. First, a plaintiff "need only provide '*enough facts* to state a claim for relief that is plausible on its face,'" *Schwake*, 967 F.3d at 947 (quoting *Twombly*, 550 U.S. at 570), and second, "[s]ex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed," *id.* at 948.

Because we previously had "not provided guidance on what allegations suffice to state a Title IX claim," *Schwake* endeavored to provide that guidance. 967 F.3d at 943. Appreciation of this guidance requires that we first briefly recount the facts of *Schwake* before turning to the sufficiency of Doe's allegations.

In *Schwake*, the plaintiff alleged that the Department of Education ("DOE") initiated an investigation of the university for Title IX violations in its handling of sexual misconduct complaints, which he argued impacted the way the university handled those cases. *Schwake*, 967 F.3d at 948. He also alleged gender-based decisionmaking, in that male respondents at his university were invariably found

guilty in disciplinary proceedings such as his, and that he was aware of recent cases against male respondents in which all were found guilty "regardless of the evidence or lack thereof." *Id.* at 949.

In his specific case, Schwake also alleged facts regarding procedural irregularities which the court found relevant. First, Schwake alleged that a university employee made public comments about the disciplinary proceeding before Schwake's appeal was complete, including that the university had "convicted [Schwake] of sexual assault." *Id.* at 949–50. Schwake alleged that the person also shared confidential and privileged information regarding his case. *Id.* Second, Schwake alleged that Dr. Hicks, an individual involved in the proceeding, refused to allow him to appeal the punishment and underlying finding of responsibility after Schwake had negotiated an alternative sanction that did not involve suspension. *Id.* at 950. He further alleged that Dr. Hicks refused to permit Schwake to file a harassment complaint against the complainant, asserting that such a complaint might result in additional sanctions including degree revocation. *Id.* Finally, Schwake made several allegations that the university's investigation was one-sided, including allegations that (1) the university failed to consider his version of the alleged assault or to follow up with witnesses and evidence he offered in his defense; (2) the university suspended him based on additional violations of the Student Code without providing an opportunity to respond; and (3) the university found him responsible without allowing him full access to evidence. *Id.* at 951.

The court concluded that the allegations of background indicia of sex discrimination, when combined with the allegations concerning the specific disciplinary case against Schwake, raised a plausible inference of gender bias

sufficient to survive dismissal on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Id.*

With the applicable pleading standard and guidance from *Schwake* in mind, we turn to Doe's Title IX claims.

B.  *The Sufficiency of Doe's Title IX Claims.*

Doe's FAC divides his relevant allegations into three categories: (1) allegations of external pressures, (2) allegations of an internal pattern and practice of bias, and (3) allegations of specific instances of bias in his case.  We consider each of these categories of allegations in turn.  We conclude that these allegations, when combined, raise a plausible inference of discrimination on the basis of sex sufficient to withstand dismissal at this stage.[9]

### 1.  Allegations of External Pressures.

The FAC alleges several facts which Doe argues point to external pressures impacting how the University handled sexual misconduct complaints around the time of Roe's complaint against him.  Specifically he points to: (1) the April 2011, "Dear Colleague" letter (the "DCL") from DOE directing schools to take "immediate action" to eliminate sexual harassment (which the court in *Schwake*, 967 F.3d at 948, noted "may be relevant" in evaluating the plausibility of a Title IX claim, even though it wasn't alleged there); (2) an investigative report by National Public Radio regarding struggles facing sexual assault victims which

---

[9] Contrary to the Regents' assertion that Doe's "inadequate briefing" should result in a waiver of any argument that the facts alleged in the FAC are linked to sex discrimination, we find that Doe's briefing specifically and distinctly argues the issue in his opening brief.  *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005).

prompted the DCL; (3) the Joint Legislature Audit Committee's audit of UCLA following student testimony to the Legislature in August 2013 about a lack of response to sexual harassment claims; (4) an April 29, 2014, guidance document from DOE regarding sexual misconduct policies in which it noted that the due process rights of the respondent should not "unnecessarily delay the protections provided by Title IX to the complainant;" and (5) an April 2014 White House report and the June 2014 Senate testimony by then-Assistant Secretary of Education Catherine Lhamon, both warning that schools violating Title IX could lose federal funding.

The Regents correctly notes that these allegations of external pressures are largely of general applicability to any federally-funded university, with only one relevant allegation pertaining to UCLA specifically—the 2013 UCLA audit. But this fact does not undermine the allegations' relevancy in evaluating the plausibility of a Title IX claim.[10] Rather, these allegations "provide[] a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, give[] rise to a plausible claim." *Purdue Univ.*, 928 F.3d at 669 (quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)).

For example, it is reasonable to infer that the DCL, the threat of losing federal funding if sexual misconduct was not vigorously investigated, and the Joint Legislature Audit Committee's audit regarding the University's "lack of

---

[10] The Regents also notes that the DCL was withdrawn in September 2017 before Doe's administrative appeal. This fact also doesn't lessen the relevancy of the letter in evaluating the plausibility of a Title IX claim in this context. *Schwake*, 967 F.3d at 948. Specifically, Doe suggests that the DCL may have impacted how UCLA handled the Title IX complaint *from its inception* in May 2017.

response to sexual harassment claims" would place "tangible pressure" on the University. When taken alongside Doe's other allegations discussed below, it is plausible that such pressure would affect how the University treated respondents in disciplinary proceedings on the basis of sex, even in 2017. *Schwake*, 967 F.3d at 948; *Baum*, 903 F.3d at 586; *Doe v. Columbia Univ.*, 831 F.3d 46, 57–58 (2d Cir. 2016).

Accordingly, we find that these allegations of external pressures, although alone possibly insufficient to survive a motion to dismiss, give rise to a plausible Title IX claim when evaluated in conjunction with the allegations of an internal pattern and practice of bias and of specific instances of bias in Doe's disciplinary proceedings.

## 2. Allegations of an Internal Pattern and Practice of Bias.

The FAC also alleges several facts which Doe contends show an internal pattern and practice of bias in the University of California system, and at UCLA in particular. These include: (1) allegations of state court litigation in which California courts have found that the University of California deprived male students of fair proceedings in adjudicating misconduct allegations; (2) allegations of articles and blogs either authored by University leaders, printed in University newspapers, or hosted on University websites suggesting concern for victims or appearing to be "pro-complainant;" (3) allegations of a 2016 report by a UCLA Title IX coordinator citing an event about countering toxic masculinity as a "campus achievement;" (4) allegations that UCLA is being investigated for providing scholarships and programs that favor women over men; and (5) an allegation that the investigator on Doe's case, Ms. Shakoori, tweeted in October 2016 the following:

"Instead of women having to constantly prove that we are not 'crazy' but rational and disciplined emotionally we need to teach young boys and men how to express their feelings and how to handle others' emotions. . . ."

The Regents dismiss the relevancy of these allegations as being insufficient to show gender bias.  The Regents' point is well-taken.  Most of these allegations are gender neutral on their face, and for those that do reference gender, Doe's FAC fails to connect how these allegations could give rise to a plausible inference of bias in his disciplinary proceeding.  For example, making arguably feminist statements, like the ones in Ms. Shakoori's 2016 tweet, is not alone sufficient to support a reasonable inference that an individual is biased against men.  *See Doe v. Miami Univ.*, 882 F.3d 579, 593 n.6 (6th Cir. 2018).

However, the FAC alleges several other facts which demonstrate an internal pattern of gender-based decisionmaking against male respondents.  First, Doe alleges that the respondents in Title IX complaints that UCLA decided to pursue from July 2016 to June 2018 were overwhelmingly male (citing specific statistics for each of those years), and that the Regents doesn't report by gender the percentage of respondents found to have violated campus policy.  Doe also alleges that the University "has never suspended a female for two years based upon these same circumstances, nor [has it] used the reasoning that two years is a minimum suspension when issuing a suspension to a female … under these types of facts…."  As we noted in *Schwake*, these are precisely the type of non-conclusory, relevant factual allegations that the district court may not freely ignore. *Schwake*, 967 F.3d at 949.

The Regents contends that these allegations are insufficient to show that it treated men and women differently in such contexts, arguing that unlike Schwake, Doe has no personal awareness of such facts[11] and that the gender breakdown of complainants and respondents could be attributed to numerous possible factors that are not gender bias.  But a lack of further detail does not render these allegations insufficient at the pleading stage, particularly because "[i]t may be difficult for a plaintiff to know the full extent of alleged discrimination in decisionmaking before discovery allows a plaintiff to unearth information controlled by the defendant."  *Schwake*, 967 F.3d at 949. This is particularly true where, as here, any purported non-biased explanation for the enforcement statistics alleged by Doe would necessarily be maintained by the Regents.

Moreover, after *Schwake*, a plaintiff need not satisfy the selective enforcement theory discussed in *Austin* to state a Title IX claim.  *Schwake*, 967 F.3d at 951.  It follows that the asymmetrical enforcement allegations we've identified can, and here do, lead to a plausible inference of discrimination on the basis of sex, at least when considered in conjunction with the other well-pleaded facts regarding external pressures and specific instances of bias in Doe's case.

---

[11] The Regents contends that many allegations regarding biased enforcement are stated "on information and belief" and therefore need not be accepted as true.  Notably, the three allegations which we have identified here were not alleged "on information and belief," and we therefore accept those allegations as true.  *See Karasek*, 956 F.3d at 1104.

### 3. Allegations of Specific Instances of Bias in Doe's Case.

The above allegations taken together sufficiently allege background indicia of sex discrimination.  However, to survive a motion to dismiss, Doe "must combine [those allegations] with facts particular to his case." *Schwake*, 967 F.3d at 949 (alteration in original) (quoting *Columbia Coll. Chi.*, 933 F.3d at 855).  We hold that Doe has sufficiently done so.

First, the FAC alleges that Jason Zeck, UCLA's Respondent Coordinator, advised Doe in July 2017, during the pending Title IX investigation, that "no female has ever fabricated allegations against an ex-boyfriend in a Title IX setting."  The Regents' position that Mr. Zeck's alleged statement cannot possibly be true because Doe was only found responsible for one of the thirteen alleged incidents of misconduct brought against him by Roe is simply untenable.[12]

Instead, as we must accept this well-pleaded allegation as true, Mr. Zeck's statement suggests that UCLA's Title IX officials held biased assumptions against male respondents during the course of Doe's disciplinary proceeding. Particularly given the ultimate findings of Roe's numerous fabrications, Mr. Zeck's statement plausibly supports an inference that the Regents prejudged Roe's allegations (and Doe's defenses thereto) during its investigation on the basis of their respective genders.

---

[12] An alternative explanation might be that, when confronted by a claim that lacked merit, the University rushed to judgment in issuing the two-year interim suspension and then sought out a way to find the accused responsible for something in order to justify its earlier actions.

Contrary to the Regents' argument, "statements by 'pertinent university officials,' not just decisionmakers, can support an inference of gender bias." *Schwake*, 967 F.3d at 950 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Mr. Zeck's comments are relevant because he served as the "Respondent Coordinator" throughout the Title IX investigation. So while not a decisionmaker, Mr. Zeck was familiar with UCLA's Title IX process and the facts underlying Doe's case. It is therefore reasonable to infer that Mr. Zeck's statement reflects the broader gender assumptions within UCLA's Title IX office during its investigation of Doe.

Second, the FAC alleges that Associate Dean Rush, the ultimate decisionmaker here, advised Doe that if she were in his shoes, she would have invited Roe into her office during the February 2017 incident. Associate Dean Rush's comment suggests that she did not view Roe as an aggressor, and at the very least raises the question of whether, if the gender roles were reversed, Associate Dean Rush would have made the same recommendation to a female approached by her angry, male ex-fiancé when he showed up unannounced to confront her at her place of employment.

The FAC further alleges several additional facts which, if assumed to be true, demonstrate irregularities in Doe's proceedings that, while not dispositive on their own, support an inference of gender bias. *Schwake*, 967 F.3d at 951 (holding that procedural irregularities are relevant to determining gender bias).

For example, the FAC alleges that the University demonstrated its disparate treatment of Doe as a male during its investigation by failing to investigate his claim that Roe

was not a student at the time of the incident[13] and not discrediting Roe when it became apparent that Roe had misrepresented her status as a student and falsely stated that she fractured a rib on February 13.  The FAC also alleges other irregularities in the investigation including the fact that Ms. Shakoori made findings of violations of policy not included in the Joint Notice or Amended Joint Notice of Charges.

The FAC enumerates several other allegations of irregular proceedings during the appeal hearing itself, including that (1) the burden was placed on Doe, not the University; (2) Doe was not permitted to speak at the appeal hearing[14]; (3) fact witness testimony supporting Doe's account of the events was discounted, while witness testimony supporting Roe's account was accepted without the need for an independent interview by the appeal panel; (4) Associate Dean Rush evidenced gender bias when she falsely stated that the two-year suspension was required by SVSH Policy for *any* type of dating violence; and (5) the appeal panel only found that Roe was in fear of "bodily injury," not "serious bodily injury" as required by the policy. Additionally, the FAC referenced the state court's ruling on

---

[13] Roe's status as a non-student at the time of the incident would not preclude the University from proceeding with investigating her complaint under Title IX because her complaint also included allegations of misconduct dating back to 2014, when she was a student at UCLA.

[14] It is not clear from the FAC whether these first two allegations suggest that the Regents failed to comply with their own policies, or whether Doe merely suggests that these procedures are inherently problematic, regardless of the University's adopted policies. Nevertheless, even if the University's policies in place at the time condoned these procedures, Doe is entitled to allege that such policies were inherently problematic, as he has done here.

the motion for stay in the writ proceeding, wherein the court found that the evidence did not support the Regents' findings.

Although the Regents contends that these allegations of procedural irregularities do not suggest that gender was the reason for the supposed errors, this Circuit, as well as the Seventh and Sixth Circuits, have found similar irregularities support an inference of gender bias, particularly when considered in combination with allegations of other specific instances of bias and background indicia of sex discrimination. *See, e.g.*, *Schwake*, 967 F.3d at 951 (finding sex discrimination claim plausible based in part on allegations that the university failed to consider the male accused's version of the alleged assault or to follow up with witnesses and evidence offered in his defense); *Purdue Univ.*, 928 F.3d at 669 (finding sex discrimination claim plausible based in part on allegations that the university's Title IX investigator credited the story of the female accuser over the accused male student although the investigator had never spoken with the accuser); *Baum*, 903 F.3d at 586 (finding sex discrimination claim plausible based in part on allegations that the appeals board exclusively credited female testimony and rejected all male testimony).

The fact that the Regents ultimately found Doe not responsible for twelve of the thirteen allegations made against him does not make the allegations of irregularities in the proceedings any less relevant to our inquiry. *See, e.g.*, *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019); *Columbia Univ.*, 831 F.3d at 56–57; *Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) ("Procedural irregularities provide strong support for Doe's claim of bias here."), *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020) (finding that a complaint which alleged both "a

dubious decision in [the plaintiff's] particular case taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" was sufficient to survive a motion to dismiss); *Doe v. Univ. of Denver*, 1 F.4th 822, 831–32 (10th Cir. 2021) (rejecting a university's argument that its employees "were biased against sexual-misconduct *respondents*, regardless of their sex" where the plaintiff alleged that the university's "investigation was replete with procedural deficiencies, all of which favored Jane [Roe] and disfavored him, despite substantial reasons to discount her allegations"). Rather, at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise.

Taken together, Doe's allegations of external pressures and an internal pattern and practice of bias, along with allegations concerning his particular disciplinary case, give rise to a plausible inference that the University discriminated against Doe on the basis of sex. The fact that sex discrimination is "a plausible explanation" for the University's handling of the disciplinary case against Doe is sufficient for his Title IX claim to survive a motion to dismiss. *Schwake*, 967 F.3d at 948. While Doe "may face problems of proof, and the factfinder might not buy the inferences that he's selling," his Title IX claim makes it past the pleading stage. *Purdue Univ.*, 928 F.3d at 670.

IV.

At this stage of the proceeding, we conclude that Doe has sufficiently stated a Title IX claim against the Regents. Accordingly, we reverse and vacate the district court's order

and judgment dismissing the claims with prejudice, and remand for further proceedings consistent with this opinion.

**REVERSED, VACATED, and REMANDED.**[15]

---

[15] The Regents' request for judicial notice (Dkt. 22) is **DENIED**, without prejudice to the Regents seeking admission of these documents in further proceedings below.  We cannot take judicial notice of disputed facts contained in public records, which is what it appears the Regents asks us to do here.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).